Timothy W. SCHMIDT, Plaintiff,

v.

RHONE–POULENC, INC., Defendant.

No. CV–96–033–BU.

United States District Court,
D. Montana,
Butte Division.

April 28, 1998.

Bernard J. Everett, Knight, Dahood, McLean, Everett & Dayton, Anaconda, Paul M. Warren, Warren Law Office, Billings, MT, for Timothy W. Schmidt, plaintiff.

Brendon J. Rohan, Poore, Roth & Robinson, PC, Butte, MT, for Rhone–Poulenc, Inc., defendant.

### MEMORANDUM AND ORDER

HATFIELD, Senior District Judge.

### BACKGROUND

The defendant herein, Rhone–Poulenc, Inc., operates an elemental phosphorous plant located approximately six miles west of Butte, Montana. The plaintiff, Timothy W. Schmidt, worked at the plant from 1979 through January 27, 1995, during which time he held various labor positions.

In January, 1995, Rhone–Poulenc began a "digout" of their No. 1 furnace.[1] The digout was performed by an independent contractor known as "Versahoe." Schmidt's job was to assist the Versahoe employees by operating an overhead crane and monitoring the levels of phosphine[2] and carbon monoxide in the furnace area.

On January 16, 1995, Rhone–Poulenc's employees, as one of the initial steps in the digout procedure, disconnected a furnace bucket overflow drainline ("drainline") located on the furnace's roof. The drainline served to transport contaminated water from the electrode water seal buckets[3] to a contaminated water sump located several floors below the roof of the furnace.[4] After the drainline was disconnected, tests revealed no phosphine was present in the drainline. Consistent with past practices, the drainline's open end was not sealed,[5] and the drainline remained open for seven days without a reported release of phosphine.

On or about January 23, 1995, Tom Schafer, the Rhone–Poulenc employee assigned to work in the furnace area, discovered phosphine emanating from the drainline. Subsequent tests revealed a phosphine concentration, at the mouth of the drainline, in excess of 50 parts per million.[6] Upon discovering the high level of phosphine, Schafer notified Rhone–Poulenc's industrial hygiene officer, Paul Carlson, and Schafer's supervisor, Andy Neff. After examining the drainline, Neff determined the quickest, most effective, and best way to prevent further exposure to phosphine, would be to plug the drainline with a large "mudball"[7] made from a

1. During a digout, the furnace is shutdown, the carbon blocks which form the furnace floor and walls are repaired or replaced, and sometimes a new furnace roof is installed. In addition, the furnace's contents, which include iron, slag and raw materials used in the production of phosphorous, are removed.

2. Phosphine is a colorless, flammable, and toxic gas created by a chemical reaction occurring when elemental phosphorous comes in contact with water. Phosphine enters the body by absorption into the mucus membranes of the nose and throat. Initial effects of phosphine exposure include headache, restlessness, dizziness, loss of feeling, impaired gait, trembling of extremities during movement, double vision, and stupor. Severe exposure can cause seizures and coma.

3. Each furnace has three electrode water seal buckets located on the roof of the furnace. The apparent function of the electrode water seal buckets is to prevent furnace gases from escaping through the openings in the furnace roof which accommodate the furnace electrodes.

4. The water in the sump is contaminated with, among other things, elemental phosphorous.

5. The drainline had not been sealed during previous furnace digouts because the drainline was not a known source of phosphine.

6. Regulations implemented by the Occupational Safety and Health Administration ("OSHA") set the short term exposure limit for phosphine at 1 part per million.

7. The mudball used to plug the drainline weighed approximately four pounds. The use of a mudball to plug the drainline was not prohibited by any plant rule or regulation in existence on January 23, 1995.

clay-like material routinely used to seal the furnace's tap holes.[8] A metal cap was not installed because the drainline did not have a flange that would accommodate a metal cap.[9]

After the mudball was placed in the drainline, tests were periodically conducted to determine whether phosphine was escaping from the drainline. No phosphine was detected while the mudball was in the drainline. The mudball apparently worked as an effective plug until January 27, 1995.

Sometime in the early morning hours of January 27, 1995, Jim Walund, a shift supervisor, discovered the mudball had fallen out of the drainline. Walund reformed the mudball and reinserted it into the drainline. Shortly thereafter, at approximately 5:00 A.M., the mudball shot out of the drainline and flew across the roof of the furnace. When Walund learned the mudball had discharged with an explosive force, he inserted a new mudball in the drainline and instructed Schmidt and Ray Maldonado, another Rhone–Poulenc employee, to test the furnace area for phosphine while he attempted to located the source of the gas accumulating in the drainline.[10]

While Walund was tracing out the drainline, Schmidt left the furnace control room to conduct a phosphine test in the area near the drainline. As Schmidt approached the drainline, the mudball violently discharged from the drainline and greenish smoke began to fill the air. Schmidt quickly conducted a phosphine

test, cleared the area of other workers, and returned to the control room. While Schmidt was in the control room, he began to feel numb and dizzy, vomited and collapsed. Schmidt was immediately transported to St. James Community Hospital in Butte, where he was admitted and treated for phosphine exposure.

On March 8, 1996, Schmidt instituted the above-entitled action, seeking monetary damages for injuries resulting from his exposure to phosphine gas. Schmidt seeks to impose liability upon Rhone–Poulenc based upon that entity's conduct which, Schmidt maintains, intentionally exposed him to phosphine, knowing that such an exposure would result in injury. Presently before the court is Rhone Poulenc's motion for summary judgment, pursuant to Fed.R.Civ.P. 56, asserting the exclusivity provision of Montana's Workers Compensation Act, Mont.Code Ann. § § 39–71–411 (1997),[11] bars Schmidt's claims. Having reviewed the record herein, together with the parties' briefs in support of their respective positions, the court is prepared to rule.

## DISCUSSION

Mont.Code Ann. § 39–71–411 (1997) provides that an employee's exclusive remedy for injury or death which occurs during the course of employment is to pursue those rights provided by the Workers Compensation Act. The only exception to the exclusivity provision is found at Mont. Code Ann. § 39–71–413 (1997), which provides:

8. A tap hole is a hole located near the bottom of the furnace which is periodically opened to allow molten slag and iron to exit the furnace.

9. After the mudball was placed in the drainline, both Neff and Carlson assured Schafer they would ask the Maintenance Department to weld a flange on the drainline and install a metal cap. Despite these assurances, a metal cap was not installed.

10. The record is not clear whether Walund inserted another mudball in the drainline before he attempted to locate the source of the gas accumulating in the drainline. Walund

testified in his deposition that he did not insert a mudball in the drainline. Schmidt testified to the contrary. For purposes of the present motion, the court will assume Schmidt's version of the facts are accurate.

11. Schmidt's complaint invokes the diversity jurisdiction of this court under 28 U.S.C. § 1332. Accordingly, the law of Montana controls the substantive issues of law presented by this controversy. See, Erie Ry. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

If an employee receives an injury while performing the duties of his employment and the injury or injuries so received by the employee are caused by the intentional and malicious act or omission of a servant or employee of his employer, then the employee or in case of his death his heirs or personal representatives shall, in addition to the right to receive compensation under the Workers Compensation Act, have a right to prosecute any cause of action he may have for damages against the servants or employees of his employer causing the injury.

In the past, the Montana Supreme Court has been divided over the meaning of "intentional and malicious," as used in Mont.Code Ann. § 39–71–413, and the degree of culpability necessary to bring an employer's conduct within the statutory exception to the exclusivity provision. *Kortes v. Pool Co.*, 270 Mont. 474, 893 P.2d 322, 325 (1995), *citing, Blythe v. Radiometer America, Inc.*, 262 Mont. 464, 866 P.2d 218 (1993) (Trieweiler, J., Harrison, J., and Hunt, J., dissenting); *Noonan v. Spring Creek Forest Products*, 216 Mont. 221, 700 P.2d 623 (1985) (Sheehy, J., Hunt, J., and Harrison, J., dissenting). However, there is no disagreement that, based on the plain language of these provisions, something more than mere negligence must be alleged to fall within the statutory exception. *Id.*

> The 'intentional harm' which removes an employer from the protection of the exclusivity clause of the Workers Compensation Act is such harm as it maliciously and specifically directed at an employee, or class of employee out of which such specific intentional harm the employee receives injuries as a proximate result. Any incident involving a lesser degree of intent or general degree of negligence not pointed specifically and directly at the injured employee is barred by the exclusivity clause as a basis for recovery against the employer outside the Workers Compensation Act.

*Great Western Sugar Co. v. District Court*, 188 Mont. 1, 610 P.2d 717, 720 (1980).[12]

In a subsequent decision, *Blythe v. Radiometer America*, 262 Mont. 464, 866 P.2d 218 (1993), the Montana Supreme Court reaffirmed its adherence to the rule established in *Great Western Sugar Co.*, concluding the plaintiff therein had failed to allege sufficient malicious and intentional conduct on the part of his employer. The court reiterated that the grossly negligent conduct of an employer or a co-employee does not constitute "intentional and malicious" conduct. *Blythe, supra*, 866 P.2d at 221. In addition, the court held the type of malice necessary to satisfy Mont.Code Ann. § 39–71–413 was set forth in Mont. Code Ann. § 1–1–204(3), *i.e.*, "a wish to vex, annoy, or injure another person," rather than "actual malice" as define at Mont.Code Ann. § 27–1–221(2).[13] *Id.* at 225

In *Lockwood v. W.R.Grace & Co.*, 272 Mont. 202, 900 P.2d 314 (1995), the court focused upon the plaintiff's allegations of "intentional harm,"[14] and determined the plaintiff's complaint contained sufficient allegations to avoid the exclusivity provision

> [I]f [he] has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and: (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

12. In *Great Western Sugar*, the plaintiff alleged his employer "wantonly, maliciously and carelessly placed him in a position of danger, committing the equivalent of an intentional harm." However, because the complaint alleged no more than negligence, albeit wanton or malicious negligence, the Montana Supreme Court ultimately held the plaintiff's claims fell within the exclusive remedy afforded by the Workers' Compensation Act. *Great Western Sugar, supra*, 610 P.2d at 719–20.

13. Mont.Code Ann. § 27–1–221(2) provides that a person acts with malice:

14. Specifically, the plaintiff's complaint alleged, *inter alia*, her husband's employer (1) knew or had reason to know that extended inhalation or continuous ingestion of vermiculite and asbestos particles created a high degree of risk or harm to its' employees; (2)

of Montana's Occupational Disease Act, Mont.Code Ann. § 39–72–305 (1983).

> These allegations are not mere allegations of intentional acts, omissions or conduct in the traditional tort context. Nor, of course, are they allegations of any desire by [the employer] to harm its employees. As Professor Larson cautions, intent to injure does not mean desire to injure; it means that the employer intended that the employee should undergo the injury—the exposure to the harm—of which the employer knew on a daily basis. 2A, Larson's *Worker's Compensation Law*, § 68.15(e), at 13–107. This constitutes the allegation of intentional harm specifically and maliciously directed at an employee.

*Lockwood, supra,* 900 P.2d at 319.

In a recent decision, *Schmidt v. State of Montana,* 286 Mont. 98, 951 P.2d 23 (1997), the Montana Supreme Court reaffirmed its allegiance to *Great Western Sugar Co.,* while at the same time recognizing the presence of certain inconsistencies in prior decisions, particularly with respect to the interplay between an employer's conduct and the "intentional and malicious" standard.

> Without attempting to reconcile the inconsistencies in our prior decisions, and to further reconcile those decisions with the plain language of § 39–71–413,

MCA, we reaffirm our commitment to at least that part of our decision in *Great Western Sugar Co.* which held that allegations of negligence, no matter how wanton, are insufficient to avoid the exclusive remedy of the Workers Compensation Act. We conclude, based on the undisputed facts established in this case, that [the plaintiff] has not established that an employee of the State of Montana committed an intentional act with malice, which caused injuries to [the employee]. We arrive at that conclusion regardless of whether we apply the definition of malice found at § 1–1–204(3), MCA, or that found at § 27–1–221, MCA.

*Schmidt v. State of Montana, supra,* 951 P.2d at 28.

In the case *sub judice,* the record establishes Rhone–Poulenc was aware of the dangerous propensities of phosphine, and took steps to educate and train its' employees in dealing with that substance.[15] Accordingly, the present action is factually distinguishable from *Lockwood v. W.R.Grace & Co.,* where the employer allegedly knew its acts created a high degree of harm to its' employees and actively concealed that knowledge from its' employees. Rather, the present action is more akin to *Schmidt v. State of Montana,* in that the actions of Rhone–Poulenc, while

willfully and deliberately concealed its knowledge from its' employees; (3) failed to provide protective equipment sufficient to avoid the danger; and (4) advised its' employees that it was safe to work continuously in close proximity to vermiculite and asbestos particles. Plaintiff alleged the employer's acts and omissions proximately caused her husband's mesothelioma and, ultimately, his death. *Lockwood, supra,* 900 P.2d at 318.

15. During a furnace digout in 1989, a number of Rhone–Poulenc employees became ill or were injured as a result of overexposure to phosphine gas while manually removing the contents from the furnace. Prior to the October 1989 incident, there were no documented cases of phosphine overexposure during a furnace digout at the plant, although manual digouts of the plant's two furnaces had occurred since the construction of the plant in the early 1950's.

Following the exposure incident in 1989, there was a heightened concern by Rhone–Poulenc about phosphine in the plant and in particular during digouts. Accordingly, Rhone–Poulenc employees, including Schmidt, were provided with training on where phosphine may be found in the plant, the symptoms of phosphine exposure, precautions to be taken to avoid overexposure, and proper methods of testing for phosphine. After 1989, the removal of the furnace contents during a furnace digout was no longer done manually by Rhone–Poulenc employees entering the furnace cavity. Independent contractors were hired to mechanically remove the furnace contents by using a backhoe. During the January 1995 digout, the entire furnace was encapsulated in plastic to prevent harmful gases and smoke from escaping into other areas of the plant.

negligent, were not specifically and maliciously directed at Schmidt or any of his co-employees.

Accordingly, having reviewed the record herein,[16] the court is compelled to conclude Schmidt has not demonstrated any intentional or malicious act on the part of Rhone–Poulenc which resulted in injury to Schmidt during the course of his employment. As a result, the court concludes Schmidt's claims are barred by Mont.Code Ann. § 39–71–411, the exclusive remedy provision of the Workers' Compensation Act.

## CONCLUSION

Therefore, for the reasons set forth herein, the court concludes the motion for summary judgment filed on behalf of the defendant, Rhone–Poulenc, be, and the same hereby is, GRANTED.

IT IS SO ORDERED.

---

**16.** Because the court's resolution of the pending motion for summary judgment necessarily turns on the facts of record herein, the court's decision is specifically limited to the unique facts presented in the above-entitled matter.